Jack Silver, Esq. SB# 160575
Email: lhm28843@sbcglobal.net
LAW OFFICE OF JACK SILVER
Post Office Box 5469
Santa Rosa, CA 95402-5469
Tel. 707-528-8175
Fax. 707-528-8675

David J. Weinsoff, Esq. SB# 141372
Email: david@weinsofflaw.com
Law Office of David J. Weinsoff
138 Ridgeway Avenue
Fairfax, CA 94930
Tel. (415) 460-9760
Fax. (415) 460-9762

Attorneys for Plaintiff
CALIFORNIA RIVER WATCH

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA RIVER WATCH, a 501(c)(3) non-profit, public benefit Corporation,<br><br>Plaintiff,<br>v.<br>CITY OF INGLEWOOD,<br>Defendant._____/ | CASE NO. 2:14-cv-09244<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL PENALTIES, RESTITUTION AND REMEDIATION [Environmental - Clean Water Act 33 U.S.C. § 1251 *et seq*.]** |

NOW COMES plaintiff CALIFORNIA RIVER WATCH a 501(c)(3) nonprofit, public benefit corporation ("RIVER WATCH") by and through its attorneys, and for its Complaint against Defendant CITY OF INGLEWOOD ("INGLEWOOD") states as follows:

**I.   NATURE OF THE CASE**

1.   This is a citizens' suit for relief brought by RIVER WATCH under the Federal Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq*., including 33 U.S.C. § 1365, 33 U.S.C. §1311, and 33 U.S.C. § 1342, to prevent INGLEWOOD from repeated and ongoing violations of the CWA.  These violations are

1

Complaint

detailed in the "Notice of Violations and Intent to File Suit" dated August 29, 2014, made part of the pleadings of this case, and attached hereto as EXHIBIT A ("CWA NOTICE").

2. RIVER WATCH alleges INGLEWOOD obtained coverage as a facility operator under California's General Industrial Storm Water Permit for Industrial Storm Water Discharges, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ (as amended by Water Quality Order 97-03-DWQ) issued pursuant to CWA § 402(p), 33 U.S.C. § 1342(p) (hereafter, "General Permit"), for the City of Inglewood Waste Transfer Station facility operated at the City Service Center located and operating at 222 West Beach Avenue in the City of Inglewood, County of Los Angeles, California ("the Facility").

3. RIVER WATCH alleges INGLEWOOD is routinely violating the substantive and procedural requirements of CWA § 402(p) and the General Permit relating to recycling services at the Facility, by failing to fully comply with the General Permit's mandatory sampling, monitoring and reporting requirements, as well as failing to implement effective Best Management Practices ("BMPs") in the Storm Water Pollution Prevention Plan ("SWPPP") for the Facility, resulting in the illegal discharge of pollutants (specific conductance, total suspended solids, pH, copper, zinc, lead, iron, and aluminum) from the Facility as reported to the California State Resources Control Board ("SWRCB") in Annual Reports filed by INGLEWOOD for the Facility during the four year period 2010-2011 through 2013-2014.

4. RIVER WATCH alleges that the failure to comply strictly with the mandatory terms and conditions and BMPs required by the General Permit (identified comprehensively in the Federal Environmental Protection Agency's ("EPA") "Industrial Stormwater Fact Sheet Series, Sector N: Scrap Recycling and Waste Recycling Facilities;" (EPA Office of Water, EPA-833-F-06-029, December 2006) results in discharges in violation of the CWA's prohibition with regard to discharging a pollutant

2

Complaint

from a point source to waters of the United States, in this instance the Inglewood MS4, pursuant to CWA § 301(a), 33 U.S.C. § 1311(a), and CWA § 505(f), 33 U.S.C. § 1365(f).

Ongoing discharges from the Facility as reported by INGLEWOOD exceed the EPA "Benchmarks" for the following pollutants:

**2013-2014 Reporting Year**[1]

<u>February 27, 2014 Sample</u>:

Pre-Before Berm/Filter –

Specific Conductance – 227 µmhos/cm
Aluminum – 3.95 mg/L
Iron – 5.29 mg/L
Zinc – 0.169 mg/L

Post-After Berm/Filter –

Specific Conductance – 218 µmhos/cm
Aluminum – 1.44 mg/L
Iron – 1.94 mg/L
Zinc – 0.193 mg/L

<u>November 21, 2013 Sample</u>:

Pre-Before Berm Filter –

Specific Conductance – 863 µmhos/cm
TSS – 389 mg/L
Aluminum – 7.78 mg/L
Copper – 0.119 mg/L
Iron – 10.6 mg/L
Zinc – 0.468 mg/L

Post-After Berm Filter –

Specific Conductance – 502 µmhos/cm
TSS – 263 mg/L
Aluminum – 8.56 mg/L
Copper – 0.117 mg/L
Iron – 10.9 mg/L
Zinc – 0.771 mg/L

---

[1] EPA "Benchmarks" for the listed pollutants – Specific Conductance (SC) 200 µmhos/cm; pH 6.0 – 9.0 standard units; Total Suspended Solids (TSS) 100 mg/L; Aluminum (Al) 0.75mg/L; Iron (Fe) 1.0 mg/L; Lead (Pb) 0.0816 mg/L; Zinc (Zn) 0.117 mg/L; Copper (Cu) 0.0636 mg/L; Total Oil & Grease (O&G) 15 mg/L; COD 120 mg/L; and TOC 100 mg/L.

Complaint

**2012-2013 Reporting Year**

January 24, 2013

Pre-Before Berm/Filter –

Specific Conductance – 243 µmhos/cm
TSS – 300 mg/L
Aluminum – 18.8 mg/L
Iron – 22.2 mg/L
Zinc – 0.252 mg/L

Post-After Berm/Filter –

TSS – 134 mg/L
Aluminum – 4.43 mg/L
Iron – 5.67 mg/L
Zinc – 0.268 mg/L

November 29, 2012

Pre-Before Berm/Filter –

Specific Conductance – 297 µmhos/cm
TSS – 131 mg/L
Aluminum – 6.62 mg/L
Iron – 8.04 mg/L
Zinc – 0.205 mg/L

Post-After Berm/Filter –

Iron – 1.04 mg/L
Zinc – 0.161 mg/L

**2011 -2012 Reporting Year**

January 23, 2012

TSS – 342 mg/L
Aluminum – 10.3 mg/L
Copper – 0.074 mg/L
Iron – 15.3 mg/L
Zinc – 0.406 mg/L

December 12, 2011

Specific Conductance – 786 µmhos/cm
TSS – 1370 mg/L
pH – 5.93
Aluminum – 37.4 mg/L
Copper – 0.226 mg/L
Iron – 55.5 mg/L
Lead – 0.156 mg/L
Zinc – 0.973 mg/L

4

Complaint

**2010 -2011 Reporting Year**

<u>March 20, 2011</u>

Pre-Before Berm/Filter

Specific Conductance – 525 µmhos/cm
Aluminum – 4.04 mg/L
Iron – 4.93 mg/L
Zinc – 0.198 mg/L

Post-After Berm/Filter –

Aluminum – 1.05 mg/L
Copper – 0.064 mg/L
Iron – 5.81 mg/L
Zinc – 0.395 mg/L

<u>October 20, 2010</u>

Pre-Before Berm/Filter –

Specific Conductance – 1660 µmhos/cm
TSS – 476 mg/L
Aluminum – 20.9 mg/L
Copper – 0.185 mg/L
Iron – 33.4 mg/L
Lead – 0.151 mg/L
Zinc – 0.797 mg/L

Post-Before Berm/Filter –

Specific Conductance – 1120 µmhos/cm
pH – 9.06
Aluminum – 2.63 mg/L
Copper – 0.067 mg/L
Iron – 4.57 mg/L
Zinc – 0.483 mg/L

5. RIVER WATCH alleges that INGLEWOOD's operation at the Facility (classified under SIC Code 5093), "functions as a temporary site to store solid waste and debris generated by [Inglewood] City crews performing tree trimming, street sweeping, park maintenance, law mowing, vehicle maintenance, and trash receptacle pick-up operations … Construction materials used by Public Services for street repair including rock base, clean fill dirt, and asphalt, are also stored at the transfer station."

(http://www.cityofinglewood.org/agendastaffreports/01-29-13/8.pdf; August 28, 2014).[2] The work at the Facility is conducted both indoors and outdoors. Because the property on which the Facility is located is subject to rain events, and because there is no Regional Water Quality Control Board exemption from collecting and analyzing of the range of pollutants discharged from the Facility, there can be a discharge of these pollutants to the Inglewood MS4, which discharges to the Pacific Ocean.

6. RIVER WATCH seeks declaratory relief, injunctive relief to prohibit future violations, the imposition of civil penalties, and other relief for INGLEWOOD's violations as set forth in this Complaint.

**II.    PARTIES TO THE ACTION**

7. RIVER WATCH is, and at all times relevant to this Complaint was, an Internal Revenue Code § 501(c)(3) nonprofit, Public Benefit corporation organized under the laws of the State of California, with headquarters located in Sebastopol, California and offices in Los Angeles, California. RIVER WATCH's southern California mailing address is 7401 Crenshaw Boulevard, #422, Los Angeles, California 90043. The specific purpose of RIVER WATCH is to protect, enhance and help restore surface and ground waters of California including rivers, creeks, streams, wetlands, vernal pools, aquifers and associated environs, biota, flora and fauna; and, to educate the public concerning environmental issues associated with these environs. Members of RIVER WATCH reside in southern California where the Facility which is the subject of this Complaint is located. Said members have interests in the waters and watersheds which are or may be adversely affected by INGLEWOOD's discharges and violations as alleged herein. Said members use the effected waters and watershed areas for recreation, sports, fishing, swimming, hiking, photography, nature walks and/or the like.  Furthermore, the relief

---

[2] INGLEWOOD's operations, as stated on its NOI, are also covered under SIC Codes 4212 (Local Trucking without Storage) and 4953 (Refuse Systems). In addition, on June 13, 2012, the Regional Water Quality Control Board issued INGLEWOOD an "Annual Report Review – Second Benchmark Value Exceedance:  NPDES General Permit (Permit) For Storm Water Discharges Associated With Industrial Activity (Order No. 97-03 DWQ; NPDES No. CAS000001), WDID# 419I 011122" identifying a number of EPA Benchmark exceedances.  The violations identified in the June 13, 2012 Regional Board Review are incorporated by reference into the CWA NOTICE.

sought will redress the injury in fact, likelihood of future injury and interference with the interests of said members.

8. RIVER WATCH is informed and believes and on such information and belief alleges that Defendant INGLEWOOD is now, and at all times relevant to this Complaint was, an entity doing business as a publicly owned and operated scrap recycling operation under Standard Industrial Code No. 5093, located and operating at 222 West Beach Avenue in the City of Inglewood, Los Angeles County, California, and referred to in this Complaint as the Facility.

### III.   GENERAL

9. INGLEWOOD submitted a Notice of Intent ("NOI") to the SWRCB for coverage under the General Permit for the Facility and on or about August 18, 1994 obtained said coverage. The SWRCB assigned Waste Discharger Identification ("WDID") number 4 19I011122 to INGLEWOOD, authorizing it to operate the Facility consistent with the strict terms and requirements imposed under the General Permit. Compliance with the terms and conditions (the environmental protections) within the General Permit are not voluntary. In the absence of an express "exemption" by the SWRCB from any of the General Permit's terms and conditions, INGLEWOOD is required to comply strictly with each and every one of them. RIVER WATCH's review of the mandated Annual Reports submitted by INGLEWOOD to the Regional Water Quality Control Board, Los Angeles Region ("RWQCB") for the reporting years 2010-2011 through 2013-2014 reveals violations of the General Permit at the Facility during this time-period, specifically the failure to comply fully with the requirements to: prepare, implement, review, and update an adequate SWPPP, eliminate all non-authorized storm water discharges, and develop and implement an adequate monitoring and reporting program. These alleged violations are detailed and specifically described in the CWA NOTICE.

### IV.   JURISDICTIONAL ALLEGATIONS

10. Under 33 U.S.C. § 1251(e), Congress declared its goals and policies with regard to public participation in the enforcement of the CWA. 33 U.S.C. § 1251(e) provides,

7

Complaint

1  in relevant part:

2      Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States.

3

4

5  11.    Subject matter jurisdiction is conferred upon this Court by CWA § 505(a)(1), 33 U.S.C. § 1365(a)(1), which states in relevant part,

6

7      " … any citizen may commence a civil action on his own behalf - against any person . . . .who is alleged to be in violation of (A) an effluent standard or limitation. . . . or (B) an order issued by the Administrator or a State with respect to such a standard or limitation ..."

8

9

10      For purposes of CWA § 505, "the term 'citizen' means a person or persons having

11  an interest which is or may be adversely affected." (33 U.S.C. § 1365(g)).

12  12.    All illegal discharges and activities complained of in this Complaint and in the

13  CWA NOTICE occur in the Pacific Ocean, a water of the United States.

14  13.    Members and supporters of RIVER WATCH reside in the vicinity of, derive

15  livelihoods from, own property near, and/or recreate on, in or near, and/or otherwise use,

16  enjoy and benefit from the waterways and associated natural resources into which

17  INGLEWOOD allegedly discharges pollutants, or by which INGLEWOOD's operations

18  at the Facility adversely affect those members' interests, in violation of the protections

19  embedded in the NPDES Permitting program and the General Permit, CWA § 301(a), 33

20  U.S.C. § 1311(a), CWA § 505(a)(1), 33 U.S.C. § 1365(a)(1), and CWA § 402, 33 U.S.C.

21  § 1342.  The health, economic, recreational, aesthetic and environmental interests of

22  RIVER WATCH and its members may be, have been, are being, and will continue to be

23  adversely affected by INGLEWOOD's unlawful violations as alleged herein.  RIVER

24  WATCH contends there exists an injury in fact to its members, causation of that injury

25  by INGLEWOOD's complained of conduct, and a likelihood that the requested relief

26  will redress that injury.

27  14.    Pursuant to CWA § 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), RIVER WATCH

28  gave notice of the violations alleged in this Complaint more than sixty days prior to

commencement of this action, to: (a) Defendant INGLEWOOD via Certified Mail received by the Inglewood Public Works Director, (b) the United States EPA, Federal and Regional, and (c) the SWRCB and RWQCB. Counsel for RIVER WATCH separately provided the INGLEWOOD City Attorney with a copy of the CWA NOTICE on November 13, 2014, requesting contact to promote resolution of this dispute. RIVER WATCH RECEIVED no response to his inquiry prior to filing this Complaint.

15. Pursuant to CWA § 505(c)(3), 33 U.S.C. § 1365(c)(3), a copy of this Complaint has been served on the United States Attorney General and the Administrator of the Federal EPA.

16. Pursuant to CWA § 505(c)(1), 33 U.S.C. § 1365(c)(1), venue lies in this District as the location of Facility where the alleged illegal discharges occurred, as well as the source of the violations complained of in this action, are located within this District.

**V. STATUTORY AND REGULATORY BACKGROUND**

17. CWA § 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an individual NPDES permit or a general NPDES permit issued pursuant to CWA § 402(p), 33 U.S.C. § 1342. CWA § 402(p), 33 U.S.C. § 1342(p), establishes a framework for regulating storm water discharges under the NPDES program. States with approved NPDES permitting programs are authorized under this section to regulate storm water discharges through permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all storm water dischargers. Pursuant to CWA § 402, the Administrator of the U.S. EPA has authorized the SWRCB to issue NPDES permits including general NPDES permits in California.

18. The SWRCB elected to issue a statewide general permit for industrial discharges, and issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about

9

Complaint

April 17, 1997, pursuant to CWA § 402(p).

19. In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained an individual NPDES permit and complied with its terms.

20. The General Permit contains certain absolute prohibitions. Discharge Prohibition Order Section A(1) of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by a NPDES permit, to waters of the United States. Discharge Prohibition Order Section A(2) prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation Order Section C(1) prohibits storm water discharges to any surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation Order Section C(2) prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Basin Plan.

21. In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a NOI. The General Permit requires existing dischargers to file NOIs before March 30, 1992. Dischargers must also develop and implement a SWPPP which must comply with the standards of BAT and BCT. The SWPPP must, among other requirements:

- Identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water

discharges [Permit Section A(2)]. BMPs must implement BAT and BCT [Permit Section B(3)].

- Include a description of individuals and their responsibilities for developing and implementing the SWPPP [Permit Section A(3)]; a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity [Permit Section A(4)]; a list of significant materials handled and stored at the site [Permit Section A(5)]; and, a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, and a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur [Permit Section A(6)].

- Include a narrative assessment of all industrial activities and potential pollutant sources at the facility [Permit Section A(7)]. Include a narrative description of the BMPs to be implemented at the facility for each potential pollutant and its source, and consider both non-structural BMPs (including "Good Housekeeping") and structural BMPs where non-structural BMPs are not effective [Permit Section A(8)].

- Conduct one comprehensive site compliance evaluation by the facility operator in each reporting period (July 1- June 30), with SWPPP revisions made, as appropriate, and implemented within 90 days of the evaluation [Permit Section A(9)].

22. The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Special Condition D(1)(a) of the General Permit and meeting each of the conditions set forth in Special Condition D(1)(b).

Complaint

23. As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented. Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report [Permit Section B(14)]. Dischargers must also collect and analyze storm water samples from at least two storms per year in compliance with the criteria set forth in Permit Section B(5). Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution in compliance with Permit Section B(7).

24. Permit Section B(14) of the General Permit requires dischargers to submit an "Annual Report" by July 1 of each year to the executive officer of the relevant Regional Water Quality Control Board. Permit Section A(9)(d) of the General Permit requires the dischargers to include in the annual report an evaluation of the dischargers' storm water controls, including certifying compliance with the General Permit. *See also* Permit Sections C(9), C(10) and B(14).

25. The EPA has established Parameter Benchmark Values ("EPA Benchmarks") as guidelines for determining whether a facility discharging storm water has implemented the requisite BAT and BCT. (65 Fed. Reg. 64746, 64767 (Oct. 30, 2000)). California Toxics Rule ("CTR") limitations are also applicable to all non storm water and storm water discharges. (40 C.F.R. part 131).

26. The RWQCB has established applicable water quality standards. This Basin Plan includes a narrative toxicity standard and a narrative oil and grease standard. The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses." The Basin Plan establishes limits on metals, solvents, pesticides and other hydrocarbons.

//

Complaint

27. CWA § 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a "point source" into the navigable waters of the United States, unless such discharge is in compliance with applicable effluent limitations as set by the EPA and the applicable State agency. These limits are to be incorporated into a NPDES permit for that specific point source. Additional sets of regulations are set forth in the Basin Plan, CTR, the Code of Federal Regulation and other regulations promulgated by the EPA and the SWRCB.

28. CWA § 301(a) prohibits discharges of pollutants or activities not authorized by, or in violation of an effluent standard or limitation or an order issued by the EPA or a State with respect to such a standard or limitation including a NPDES permit issued pursuant to CWA § 402, 33 U.S.C. § 1342. The pollutants from the Facility are discharged from point sources under the CWA.

29. The affected waterways detailed in this Complaint and in the CWA NOTICE are navigable waters of the United States within the meaning of CWA § 502(7), 33 U.S.C. § 1362(7).

30. RIVER WATCH alleges INGLEWOOD has not fully developed BMPs and/or adequately implemented a SWPPP for the operations at the Facility and the property upon which the Facility is sited, as evidenced by the fact that INGLEWOOD has failed and are failing to operate the Facility in full compliance with the terms and conditions imposed by the General Permit.

**VI. VIOLATIONS**

31. The enumerated violations are detailed in the CWA NOTICE and below, designating the section of the CWA violated by the described activity

**VII. CLAIM FOR RELIEF**

**Violation of CWA § 301(a), 33 U.S.C. § 1311(a) – Violation of the terms of the General Permit.**

RIVER WATCH re-alleges and incorporates by reference the allegations of Paragraphs 1 through 31 as though fully set forth herein including all allegations in the

CWA NOTICE. RIVER WATCH is informed and believes, and on such information and belief alleges, as follows:

32. INGLEWOOD has violated and continues to violate the CWA as evidenced by its violations of the General Permit as set forth in this Complaint and the CWA NOTICE.

33. As described in the CWA NOTICE and herein, pursuant to CWA §§ 301(a) and 402(p), 33 U.S.C. §§ 1311(a) and 1342(p), and 40 C.F.R. § 122.26, RIVER WATCH alleges INGLEWOOD to be in violation of an effluent standard or limitation under the CWA and/or an order issued by the State with respect to such standard or limitation.

34. By law and by the terms of the General Permit, violations of California's General Permit are violations of the CWA. (40 C.F.R. § 122.4(a)).

35. INGLEWOOD's violations are ongoing, and will continue after the filing of this Complaint. RIVER WATCH alleges herein all violations which may have occurred or will occur prior to trial, but for which data may not have been available or submitted or apparent from the face of the reports or data submitted to the SWRCB, the RWQCB, or to RIVER WATCH with regard to the Facility prior to the filing of this Complaint. RIVER WATCH will amend this Complaint if necessary to address INGLEWOOD's State and Federal CWA violations which may occur after the filing of this Complaint. Each violation is a separate violation of the CWA.

36. RIVER WATCH alleges that without the imposition of appropriate civil penalties and the issuance of appropriate equitable relief, INGLEWOOD will continue to violate the CWA as well as State and Federal standards with respect to the enumerated discharges and releases alleged herein. Further, that the relief requested in this Complaint will redress the injury to RIVER WATCH and its members, prevent future injury, and protect the interests of its members that are or may be adversely affected by INGLEWOOD's violations of the CWA, as well as other State and Federal standards.

37. RIVER WATCH alleges that continuing violations of the CWA by INGLEWOOD will irreparably harm RIVER WATCH and its members, for which harm RIVER WATCH and its members have no plain, speedy or adequate remedy at law.

## VIII. RELIEF REQUESTED

WHEREFORE, RIVER WATCH prays that the Court grant the following relief:

38. Declare INGLEWOOD to have violated and to be in violation of the CWA;

39. Issue an injunction ordering INGLEWOOD to immediately operate the Facility in compliance with the NPDES permitting requirements in the CWA;

40. Order INGLEWOOD to pay civil penalties per violation/per day for their violations of the CWA as alleged in this Complaint;

41. Order INGLEWOOD to pay RIVER WATCH's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and,

42. Grant such other and further relief as may be just and proper.

DATED: November 25, 2014          LAW OFFICE OF JACK SILVER

By:     */s/ Jack Silver*
JACK SILVER
Attorney for Plaintiff
CALIFORNIA RIVER WATCH

Complaint